The next matter on our calendar is United States v. Damien Hicks Bailey. Good morning, Your Honor. My name is Kerry Cantwell. I represent the appellant Damien Hicks Bailey. If the court please, Mr. Bailey will be 24 years old in a week. When he was sentenced in this matter, the guidelines provided that he was at an offense level 10 and was facing a guideline range of 15 to 21 months. There was a FATICO hearing held before the district judge pursuant to 5K2.2 of the sentencing guidelines and the upshot of that was that the court imposed a sentence of 96 months on Mr. Bailey. This involved the discovery of a victim named Eric Harkins and the proof showed during the hearing that there was a meeting between my client and Mr. Harkins at a 7-Eleven store where there was a passing clasp of hands and while nothing could be seen, there was obviously a connection. He doesn't deny that he sold him drugs or that he delivered the drugs. No. So that it doesn't make a difference what the camera shows. He admits it. That's correct. At a subsequent time, Mr. Harkins was found deceased. Dead. Dead. Yes, Judge. And the medical examiner determined that Mr. Harkins had in his body an overdose amount of heroin and an overdose of an analog drug called butyrophentanyl, either one of which the medical examiner opined would have killed him. During the course of the hearing, it was determined that next to the body was a spoon and attached to the spoon by some substance was also a cotton ball. The lab took that spoon and cotton ball and through a process of washing it determined that there was the presence of heroin. Also determined there was not the presence of any fentanyl or analog. In the apartment, there was also a foil-wrapped bag of heroin in another container. There was a tiny piece of plastic found next to the needle, they call them the works, with my client's DNA on it, but no presence of any drugs on that piece of plastic. Now, there was... What was the standard? A preponderance of the evidence, Judge. And I went into that and, of course, looked at the history back and forth in the circuit about whether that should be the standard, and it seems to devolve that... Assume that that's the standard. Why doesn't all this satisfy, at least, you know, more likely than not, preponderance of the evidence? Well, I think there's enough gaps in this. There was no fentanyl found. They didn't examine the needle, so they don't know what was in the needle or the plunger or the syringe because the lab refuses to examine needles. They won't accept them for examination. So all we have is what was in his body. But I think there was a total absence of any finding as to how it got into his body or what the content or amount of heroin there would have been necessary to kill him. And also, nowhere in the apartment was there any presence of fentanyl. Don't the text messages that were reduced suggest that he had ingested and was satisfied with the heroin that had just been delivered to him? Well, he doesn't define what he ingested. All he says was it was way better. The timing was within 10 minutes of the delivery. Isn't that correct? It was, but again. Again, we have a preponderance standard. But how do we know? And it seems to be, and I don't know whether preponderance means that you can surmise or guess or use that as a way of fulfilling the standard of preponderance. I think you need more than that. Because as a defense attorney, I always want more than preponderance. Counsel, I'm prepared to agree with you that Mr. Hicks-Bailey didn't know that he was delivering something that would kill the person to whom he delivered it. But still, the act of delivering the drugs was not legal. Oh, there's no question about that. And there's a provision within the guidelines for punishment for such an act. There's a number of provisions about somebody who acts recklessly. The district judge described that he was less reckless than somebody who knew what he was delivering or less culpable than the dealer, for example. He talked about him having a minimal role. And then, of course, the other thing that came along was this girl putting out text messages saying, I killed him. And the DEA agent went out to interview her, and she says, oh, I made that up. But there was no investigation of the fellow's apartment to determine whether her DNA was there, whether she actually had gone there. So the total mystery is, how did he get the fentanyl? And it's unknowable as to how he got it. The medical examiner opined, in essence, that both the fentanyl and the heroin were each independently adequate to have killed him. Yes. But, again, we don't know whether the heroin, if it was heroin that was delivered, my client admitted to it, was a sufficient amount of heroin to kill him, or whether heroin he already had in the apartment added to what he took perhaps killed him. But, again, the mystery is, and I don't know how to resolve it, how did he get the fentanyl? Now, there were pills, loose pills, which the medical examiner said, well, they could have been fentanyl, but we didn't test them, and we destroyed them. So we don't know how he got the fentanyl. But the fentanyl would have been enough to kill him. So I think there were so many gaps in the evidentiary presentation in the Fatico hearing as to not even support a preponderance of the evidence that what my client gave him led to his death, or even that what my client gave him was ingested by him. No evidence whatsoever. Well, we can draw some inferences based on the time period. No, I understand that inferences can be drawn, but a whole panoply of inferences could be drawn, some favorable and some not so favorable. So you're saying that the text messages that Judge Carney mentioned are not evidence of anything? I don't think they're evidence that what my client delivered to him was taken by him or sufficient to kill him. He said it was way better. He said it was way better, but we don't know what he was referring to. And we don't even know whether there was some intervening delivery of something that was way better. This may be extra record, but if you know the answer, was the drug distributor arrested in this? He was not. So the person to whom he said it's way better is not part of this case and never was? That's correct. Okay. The only identification involving that was they did a cell phone search by location, and they found out that the drug distributor who was on the other end was at a different part of the city than my client. Well, I'll ask the government why it's just this guy that winds up in the net and gets charged with leading to the death of this unfortunate drug abuser. Thank you, counsel.  We'll hear from the government. Good morning, Your Honors. Mary Catherine Baumgarten for the United States. While I wasn't the prosecutor below, I am fairly familiar with this type. Counsel, you agree that Mr. Hicks Bailey probably didn't intend to murder or kill Mr. Harkins? The record contains no evidence whatsoever that the defendant intended to facilitate the death of the victim. Absolutely correct, Your Honor. And you never arrested, not you, but the government never arrested the person who supplied the drugs that may in fact have killed him? That is accurate, Your Honor, because in part, as I understand it, as Mr. Cantwell correctly noted, there was locational data from the cell phone used by the victim, also the individual that he was communicating with. As the court may know, the record reflects that law enforcement, once they identify who the individual is in the video at the 7-11, they do so in part by one law enforcement officer realizing that there is an unattended death investigation ongoing. That traffic police officer conducted a traffic stop of a vehicle that the defendant, Hicks Bailey, was driving, operating in the town of West Seneca. They identify that that individual, the car stop and the subsequent impound of that vehicle, is the same individual depicted in the 7-11 video where there's a hand-to-hand exchange, a transaction. The court correctly notes that there's extensive information that are set forth in paragraphs 13 through 16 of the PSR that contains the text messaging between the victim and the supplier. Without a doubt, the record reflects that Hicks Bailey is the courier of the drugs to the victim. Did the government seek this additional penalty in the sentencing? We did. We asked for the enhancement. It was provided for within the plea agreement. The government was entitled to ask for an enhancement under 5K1.1 for the death resulting from the drug distribution in 5K2. Did I say the wrong section? Hopefully it's not 5K1. 5K2.1. Oh, 5K1 is a safety valve. Oh, no. No safety valve. Thank you for that, Your Honor. I appreciate that. 5K- Could you address whether there's any- I mean, I was struck in reading 5K2.1 how unanchored it is in any numbers, and I wonder whether the government has any position on whether there's any maximum in terms of multiples of the offense level that could be increased. I mean, this fellow was a courier. This was a small amount. This was a terrible, terrible result and a tragedy for everyone concerned. There's no basis in the record that I could see for him to have foretold that such a terrible result would occur, and the district court in sentencing refers to some of the factors in the 5K2.1 statement, but courts have taken many different approaches. In an abuse of discretion review, it's difficult to second-guess that, but on the other hand, I do wonder whether the government's view is that there may be some limit. I mean, you made the decision not to charge him under the sentence that- It was a- Yeah, it could have had a 20-year minimum, so that reflects some sense of the lesser gravity of his role here, but can you speak to that concern? I'm concerned that it's really unbounded. In this particular case, I can speak directly to the record where the prosecutor asks, really looks at the statutory maximum, which would have been a 20-year, and that factors into the request for a guidelines range that would get to that 20 years, and that's where it was factored in here. The prosecutor, though, in the record reflects, did account for, as the court correctly noted, the minimal role. We agreed to it. We argued it at that time of sentencing to reduce it by four levels from there, and so we had asked for a range for 151 to 188. But again, I mean, the court chose level 31 kind of out of the blue, and the defense was advocating for 18 as a starting point as an offense involving reckless conduct, and analogized to manslaughter and so on, and there's just nothing in the record to suggest that he had any knowledge or expectation and so on, although obviously this is dangerous conduct. The thing, though, that I will say is that Mr. Cantwell started with sort of the humanity, and the court has noted the humanity of this particular situation, this particular case. It is a terrible tragedy, and I understand the court's concern that there could be a situation where it's unbridled. You know, somebody could go really high, and considering this court's highly deferential standard of review for an abuse of discretion, even as I've seen it in my experience, I know this court is much more experienced than I, we don't often have fatico hearings. So there was a lot of information that the court had. Maybe that's true in Buffalo. Yeah. I will be honest with you, Judge. I agree with you. For all the years, pretty old, that I've been doing this, I have never myself run a fatico hearing in the manner in which one was conducted here where there was an M.E. and things like that, because we are often, we really put to the court, I think, in a manner that the court is charged with making these sorts of decisions because the proof, if I may suggest to the court, was very clear on the actual distribution. Where did the fentanyl come from, and does it make a difference? Well, if I may just highlight something, the M.E. says fentanyl and butyryl fentanyl are two vastly different things. Butyryl fentanyl is an analog of fentanyl. Butyryl fentanyl is never available legally. You cannot get a prescription for it. You can't get a pill for it. That is the only way, and the M.E. talks about it. I double-checked on that. It's in the appendix at 113. The M.E. is quite clear on that. So butyryl fentanyl, for example, would not be a metabolite of fentanyl, metabolite being as how it's digested, the body, breaks it down. And the M.E. talks about that extensively, also about how, and it came up during. I'm just not sure what you're driving at by pointing out the butyryl fentanyl is only available legally. Well, because the argument was advanced that there was pills that could have been the source of the other lethal dose that the M.E. finds of the butyryl fentanyl. But nonetheless, in terms of causation, the M.E. suggested that both the heroin and the butyryl fentanyl independently could have caused his death. But there are circumstances that were somewhat unknown regarding, you know, exactly whether he had other heroin that he had also used and some of the factors outlined by counsel. So there was some uncertainty, at least. It wasn't, you know, the picture was somewhat complicated. Each, you're absolutely correct, Your Honor. Each substance, the butyryl fentanyl and the heroin in the decedent's body, the M.E. very clearly testifies would have caused the decedent's death. The two aggregate definitely would have caused. And the M.E. goes through and- You don't know what Mr. Hicks-Bailey delivered, whether that was a substance containing both heroin and fentanyl or not. It, the record reflects that it only contained heroin. The government's not taking the position that we can explain the butyryl fentanyl. That was very clear, that was made very clear during the sentencing proceedings below. Judge Arcaro was made aware of that. That was our position. He still issued the sentence that he issued, specifically evaluating and finding the credible evidence. And that's Judge Arcaro's term, or balancing, if you will, evaluating all of it, listening to the witnesses testify. Mr. Hicks-Bailey, he acknowledged, right, that Mr. Hicks-Bailey didn't know what he had delivered. Correct. Correct. And he gave that some weight, Mr. Hicks-Bailey. Absolutely, because the judge, in calculating, getting to the 84 to, I think it was 105, was the top of the range. He accounts for that, meaning the court, excuse me, accounts for that. And he also applies the four-level reduction off the base offense. I have a question just as a follow-up to Judge Carney's questions. Is there a situation under which a drug dealer in Mr. Hicks-Bailey's situation or position sells drugs resulting in death that would not trigger an enhancement under 5K2.1? Well, we sometimes charge the death itself. No, no, no, no, no. What I'm talking about at sentencing, is there a situation where a drug dealer sells drugs, knows that he or she is selling drugs, and that results in death, and that would not give rise to an enhancement under 5K2.1? I think if there was differing evidence, I think . . . Like what? I can't think of anything right now. I'll be . . . That's my problem. Well, the . . . Are we saying then that in every case where a drug dealer knowingly sells drugs and death results, the person ingests, does whatever, and dies, that that should result in an enhancement under 5K2.1? That's where I think it comes down to a real evaluation of what the evidence is that's presented in every single case. I know my office, because I was in . . . while I'm in the appellate section now, I was in the Drug and the Violent Crime Bureau for 11 years and reviewed these cases. I would get three, four. It doesn't . . . In answer to my question, it doesn't really matter. I gave you basically three basic facts. Drug dealer knows that he's selling drugs illegally, and it results in death. Drug dealer, drug courier. I mean, the fact that somebody is a courier could . . . The courier is less responsible than the dealer. But he got a minimal role. But that didn't excuse . . . that didn't absolve him or that didn't eliminate the 5K2.1 enhancement here. I'm trying to understand the ramifications of this argument, which is all you need to show, all the government needs to show, are three things. You're either . . . you distribute drugs, whether you're a courier or a dealer. It's a separate issue. You distribute drugs. You know that you're distributing drugs. And the person to whom you had distributed those drugs ingested and dies. And then in this particular case . . . 5K2.1. Where the court would have to find that there was a reckless or conscious disregard of the risk of distributing the drugs. I agree. I mean, Judge Arcaro specifically made that finding. And I . . . Someone once said to me, this is a long time ago, that as an AUSA, I'm entrusted with a tremendous amount of power. A tremendous amount. And the wisdom in doing the job is to evaluate when it's appropriate to use that power and how. And I think this is one of those circumstances because the humanity of these situations is tragic. It is. A young man, granted he's doing 96 months . . . You're telling me that it's . . . You're now telling me something which is more troubling, which is that it's really completely at the discretion of individual prosecutors . . .  . . . when to apply 5K2.1. No, it isn't. Because it applies across the board in every case where someone dies who's ingested illegal narcotics. It's a charging decision. I'm not going to . . . It's just like any charging . . . You could have charged him on the version . . . I don't have the site in front of me that has a 20-year . . . Mandatory minimum. Mandatory minimum, right, under 841B1, whichever. And under the . . . And you did not. Under the Burrage case, as this Court is aware, we have to show that the but-for, that but-for. And in this particular case, like is unfortunate, in many of these situations, it's what we refer to as a cocktail death. He had so many different substances in there. And as the Court aptly noted, each, according to the ME's testimony, independently and certainly in conjunction, would have killed him. So we chose not to. That was a charging decision. I agree it's . . . I mean, that's a charging decision. This is a sentencing decision. But did you ask for a specific enhancement, though? I thought it was just committed to the . . . You said that an upward departure is warranted under 5K2.1. But neither the PSR nor the government separately made a suggestion. I mean, I guess you rejected the level 18 as a starting point. We did. Did you . . . Ours was actually 38, Your Honor. That's where . . . And with the modifications, like the minimal role reduction, that's how we got to the range of 151 to 188. All right. I see my time's up. Thank you. Counsel. You have not asked for rebuttal, Mr. Campbell. We'll reserve decision. Thank you.